Filed 9/26/16  Bel Vino, LLC v. Stuart CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| BEL VINO, LLC, et. al., | D069902 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. RIC 1204612) |
| MARSHALL STUART et.al., | |
| Defendants and Respondents. | |

APPEAL from a judgment and order of the Superior Court of Riverside County, John W. Vineyard, Judge.  Affirmed.

Lieberg, Oberhansley & Strohmeyer and William H. Strohmeyer for Plaintiffs and Appellants.

Spaulding, Gomm & Brammer and J. Brady Brammer for Defendants and Respondents.

Plaintiffs Bel Vino, LLC (Bel Vino); Mike Janko (Janko), an individual and as Trustee of Bel Vue Trust u/t/a dated October 17, 2011, and American Estate

and Trust, LLC (collectively plaintiffs) appeal from a judgment and posttrial order in favor of defendants Marshall J. Stuart (Marshall), Susan E. Stuart (together the Stuarts) and Stuart Cellars, LLC (Stuart Cellars, collectively with the Stuarts, defendants) on claims related to their purchase of a winery from defendants. Plaintiffs claim the trial court erred in denying their request for relief from their waiver of a jury trial. They contend substantial evidence does not support the trial court's findings against them on their claims for misrepresentation, concealment and breach of contract related to the condition of the property. Plaintiffs also assert the trial court erred in: (1) reforming the deed to reserve cell tower lease payments to defendants; (2) amending defendants' cross-complaint at the close of evidence; and (3) awarding defendants their expert witness fees. We affirm.

I.

FACTUAL AND PROCEDURAL BACKGROUND

In 1994, Marshall Stuart, a general contractor, and his then wife, Susan, purchased real property (the property) located in Temecula. The Stuarts opened Stuart Cellars, a winery, on the property. George Cartwright acted as the chief operating officer for Stuart Cellars. At some point in time, cell towers were constructed on the property. In 2007, Riverside County cited defendants for operating an unpermitted winery. Defendants later submitted and obtained approval for a plot plan subject to certain conditions of approval. Marshall understood that the purpose of the plot plan was to legalize the winery. In 2011, the Stuarts sought to sell the winery due to their divorce.

2

Danny Martin, a commercial real estate appraiser and grape farmer, learned from Cartwright that the property was for sale. Michael Newcomb, Marshall's attorney, introduced Martin to Janko.[1] Martin conveyed to Newcomb that Janko was a very sophisticated buyer. Janko later hired Martin to help him purchase a winery, or land to develop into a vineyard. Martin told Janko that the Stuart Cellars property was for sale and the men went to look at the property. Martin drafted a letter of intent on the property for Janko, as an undisclosed principal. The letter of intent provided for a 30-day closing period.[2] After Martin signed the letter of intent, he assigned it to Janko on August 19, 2011. Around that same time, Marshall signed a term sheet with AP Wireless to sell the income stream from two leases on the cell tower for $250,000. AP Wireless did not sign the term sheet.

On August 30, 2011, Janko and Stuart met to discuss questions Janko had about the winery. At that meeting, Janko learned about regulatory or government interface issues that needed to be addressed on the property, including: bringing a

_____

[1] Newcomb was later named as a defendant, but is not a party to this appeal.

[2] Janko had the transaction set for a 30-day escrow period because he wanted to move quickly. Martin considered that time period to be "light speed" for a winery transaction. Apparently, Stuart Cellars held an annual clam bake for the public and Janko wanted to close the deal before the annual clam bake so he could realize the income from the event. Ultimately, the transaction closed on October 25, 2011, but was made retroactive to October 21 — 32 days after the contracts were signed.

fire line from the street; hooking up to a new public sewer system; and adding ingress and egress lanes.

On September 19, 2011, the parties executed an asset purchase agreement (APA) to purchase the assets of the winery and a real property purchase and sale agreement (RPPA) to purchase the property. That same day, Martin became the manager for Bel Vino, acting on behalf of and at the direction of Janko. Section 5.4 of the APA, titled "Compliance with Law," addressed zoning and land use matters. That section stated that the property was "subject to those requirements under the Plot Plan Application and Conditions of Approval affecting the Real Property."

The RPPA stated that the "Property" being sold included defendants' interest in "all leases and other rental arrangements for occupancy of the Real Property . . . including without limitation all rights to collect future rents." The RPPA provided for a "feasibility period" where defendants had five days following the effective date of the agreement to provide plaintiffs with a list of materials regarding the property, including "any notices of violation or default received by any governmental authority with respect to the property." Thereafter, plaintiffs were required to conduct a due diligence review of the property.

Janko understood that the contracts he signed provided for a feasibility period and a due diligence period, and that he could "back out of the contract" if he "uncovered some serious problems."

4

After signing the contracts, Marshall provided Janko with a copy of the plot plan. Marshall reviewed the plot plan with Janko, page by page, indicating which items had been completed. After the cover letter, the first page of the plot plan stated: "There is currently one open and active Code Violation case on the project site, CV065820, for an unpermitted winery and tasting room. This application was filed on December 13, 2007 in response to the code violation." Martin expressed concern that this might be a "deal breaker" and that the transaction might need to be renegotiated. At that point, Janko "took the whole file over" to meet with Marshall's engineering firm, Hunsaker and Associates (Hunsaker), to obtain a cost estimate for the remaining issues in the plot plan.

After defendants closed escrow and purchased the property, Martin learned that Janko was not happy about several aspects of the transaction, including that the barn had no footings and had only been approved as an agricultural building. Plaintiffs sued defendants, who later filed a cross-complaint. Plaintiffs waived their right to a jury trial and the trial court denied them relief from their waiver of a jury trial. The matter proceeded as a bench trial.

After plaintiffs rested, defendants dismissed most of their cross-complaint, leaving only their claim for cell tower related damages. Defendants also moved for judgment under Code of Civil Procedure[3] section 631.8. The trial court granted the motion and amended defendants' cross-complaint to include a claim

_____

[3] Undesignated statutory references are to the Code of Civil Procedure.

for reformation. The judgment ordered the deed reformed to reserve income from the cell tower leases to the Stuarts. Plaintiffs timely appealed from the judgment. The trial court later issued an order granting defendants their attorney fees and costs. Plaintiffs timely appealed from that order.

## II.

## DISCUSSION

### A. *Jury Waiver*

Plaintiffs contend the trial court abused its discretion in denying their request for relief from waiver of a jury trial by failing to give sufficient weight to the strong public policy in favor of jury trial requests and giving too much weight to defendants' claims of prejudice. While we may have come to a different conclusion on plaintiffs' motion, we do not find that the trial court abused its discretion in denying the request for relief from waiver of jury trial.

The right to a jury trial in a civil case is expressly guaranteed under our Constitution. (Cal. Const., art. I, § 16.) However, in a civil case the right "may be waived by the consent of the parties expressed as prescribed by statute." (*Ibid.*; § 631, subd. (f) [listing ways a party can waive trial by jury].) Payment of the jury fee by a party on one side of the case does not relieve parties on the other side of the case from a jury waiver. (§ 631, subd. (b).)

Generally, once a party has waived its right to jury trial, such waiver cannot be withdrawn except in the discretion of the trial court. (*Taylor v. Union Pac. R.R. Corp.* (1976) 16 Cal.3d 893, 898.) In determining whether to grant a motion to be

6

relieved of a jury waiver, the trial court may consider delay in rescheduling a jury trial, lack of funds, timeliness of the request and prejudice to the litigants. (*Gann v. Williams Brothers Realty, Inc.* (1991) 231 Cal.App.3d 1698, 1704 (*Gann*).) A court does not abuse its discretion where any reasonable factors supporting denial of relief can be found, even if a reviewing court, as a question of first impression, might take a different view. (*Ibid.*)

A writ of mandate is the proper remedy to secure a jury trial allegedly wrongfully withheld. (*Byram v. Superior Court* (1977) 74 Cal.App.3d 648, 654 (*Byram*); *Gann*, *supra*, 231 Cal.App.3d at p. 1704 [same]; *Winston v. Superior Court* (1987) 196 Cal.App.3d 600, 603 [same]; *McIntosh v. Bowman* (1984) 151 Cal.App.3d 357, 364 [same] (*McIntosh*).) In *Byram*, the court explained: "Perhaps the most important, though seldom articulated reason for allowing the determination of a trial court to stand is . . . '[d]efendants cannot play "Heads I win, Tails you lose" with the trial court.' Reversal of the trial court's refusal to allow a jury trial after a trial to the court would require reversal of the judgment and a new trial. It is then reasonable to require a showing of actual prejudice on the record to overcome the presumption that a fair trial was had and prejudice will not be presumed from the fact that trial was to the court or to a jury." (*Byram*, at p. 653.) As another court noted, "[j]ust as criminal defendants often play the game known as ' "waive the lawyer," ' civil litigants sometimes joust by ' "waiving the jury." ' " (*McIntosh*, at p. 363.)

The *Byram* and *McIntosh* courts required a showing of *actual* prejudice from the court's denial of their motion. (*Byram*, *supra*, 74 Cal.App.3d at p. 653; *McIntosh*, *supra*, 151 Cal.App.3d at p. 363.) On this point, we agree with the *Gann* court that "it is difficult to envision precisely how one shows prejudice from denial of a jury trial aside from that inherent in deprivation of a constitutional right." (*Gann*, *supra*, 231 Cal.App.3d at p. 1704.)[4] In any event, even without requiring plaintiffs to demonstrate some prejudice from the court's denial of their motion, we find no abuse of discretion.

Here, the trial court found, and plaintiffs do not dispute, that they made a strategic decision to waive their right to a jury trial. Plaintiffs did not seek writ review of the trial court's denial. Instead, they waited until after the bench trial, where they were unsuccessful, and sought appellate review and a new trial. The sole issue presented is whether the trial court erred in denying relief. Critically, we are reviewing the discretionary denial of relief from the waiver, not the denial of the underlying constitutional right to a jury trial.

---

[4]   As plaintiffs note, other cases have reversed judgments on appeal following the refusal to grant relief from a jury waiver without requiring a showing of actual prejudice. (*Boal v. Price Waterhouse & Co.* (1985) 165 Cal.App.3d 806, 810-811; *Bishop v. Anderson* (1980) 101 Cal.App.3d 821, 823-825; see also *Massie v. AAR Western Skyways, Inc.* (1992) 4 Cal.App.4th 405, 412.) Notably, none of these cases address the *Byram* line of authority requiring that parties proceed via writ of mandate to challenge the allegedly wrongful denial of a jury trial. Additionally, all of these cases involved an inadvertent waiver of a jury trial, not a strategically made decision to waive a jury as presented here.

8

Defendants argued below that their trial preparation was geared toward a judge who is more familiar with the issues. This preparation included: choosing exhibits; how they prepared their experts; the type of technology to use; and how to present and argue the case. These are not small matters. Moreover, as defendants noted in their opposition to the motion, the case involved questions regarding agency and the parole evidence that would have required extensive pretrial evidentiary hearings, whereas if the case were tried to the court, the court could hear all the evidence and resolve evidentiary disputes at the same time. Plaintiffs acknowledged the need to hold evidentiary hearings if the case were tried to a jury in pretrial correspondence with defendants. At that time, defendants believed the entire case could be tried to the court in four or five days. However, it took plaintiffs 16 days to present their case to the court. Had plaintiffs tried the case to a jury, it is highly likely that the case would have taken even longer to try. Thus, trying the matter to a jury would have prejudiced defendants by increasing the trial length and defendants' attorney fees.

Finally, although not addressed by the trial court, Newcomb represented himself at trial because plaintiffs' case against him involved the simple factual issue whether he had acted as plaintiffs' attorney. Newcomb did not hire counsel, file motions in limine or depose plaintiffs' agency expert because the case would be tried without a jury. Newcomb also voiced his displeasure that while respective counsel for plaintiffs and defendants exchanged e-mail correspondence regarding

9

whether the matter would be tried to a court or a jury, he was not included in these e-mails. Thus, prejudice to Newcomb supported the trial court's ruling.

Under these circumstances, plaintiffs have not demonstrated an abuse of the trial court's discretion in the denial of their request for relief from their jury waiver.

B.  *Sufficiency of the Evidence*

1.  *General Legal Principles*

A party may move for judgment in its favor after the opposing party has completed the presentation of its evidence. (§ 631.8, subd. (a).) The trial court, sitting as trier of fact, may weigh the evidence and order judgment in favor of the moving party. (*Ibid.*) We review the court's order under section 631.8 for substantial evidence. (*Fink v. Shemtov* (2012) 210 Cal.App.4th 599, 608.) We draw all reasonable inferences and resolve any evidentiary conflict in support of the trial court's decision. (*Combs v. Skyriver Communications, Inc.* (2008) 159 Cal.App.4th 1242, 1263.) The trial court weighs the credibility of witnesses and evidence and may choose to believe some witnesses and not others. (*Ibid.*)

" 'A party who challenges the sufficiency of the evidence to support a particular finding must *summarize the evidence* on that point, *favorable and unfavorable,* and *show how and why it is insufficient.* [Citation.]' [Citation.] . . . 'He cannot shift this burden onto respondent, nor is a reviewing court required to undertake an independent examination of the record when appellant has shirked

10

his responsibility in this respect.' " (*Huong Que, Inc. v. Luu* (2007) 150 Cal.App.4th 400, 409 (*Huong Que*).)

### 2. *Misrepresentation and Contract Claims*

#### a. *Additional background*

When the Stuarts initially purchased the property it contained several structures, including a pole barn that had been permitted in 1979 as an agricultural building. A pole barn consists of poles that hold up rafters, with the poles being the sole foundation for the building. A pole barn has no footings and the walls of the pole barn provide shelter, but no structural support, and can come off if not needed.

One area of the pole barn had an open area with a dirt floor. Defendants later replaced the dirt floor with a cement floor. Marshall did not obtain a permit for the cement floor because the building was for agricultural use. Another area of the pole barn had two-stories, consisting of a storage area, kitchen and bathroom below and a living space above.

In 2004, Marshall installed an unpermitted 15-foot-tall and approximately 126-foot-long retaining wall on the property. Marshall admitted that he should have obtained a permit for the wall, that the unpermitted wall existed on the property when he sold it to plaintiffs and that he did not disclose to Janko that the wall was not permitted. Marshall, however, had spoken to John Petty, a Riverside County commissioner, about the retaining wall. Marshall understood that the plot plan forgave him for not having a permit because the retaining wall was listed as

11

an existing structure that would be approved during the planned commission hearing by showing how the wall had been constructed. Through his engineer, Marshall understood that while work is done on the approved plot plan any citations are waived, and when escrow closed there were no citations or outstanding issues on the property.

Plaintiffs' operative complaint contained causes of action for intentional and negligent misrepresentation and fraudulent concealment. Among other things, plaintiffs alleged that defendants intentionally or negligently failed to disclose or concealed that improvements on the property were built without permits and in violation of local building and safety ordinances. Plaintiffs also alleged that defendants breached their warranty in the RPPA that the property was not in violation of any law, statute or ordinance.

In its statement of decision, the trial court noted that the RPPA provided for a feasibility period whereby plaintiffs could conduct due diligence on the property. The court found that, to the extent plaintiffs' complaints constituted a breach of either the APA or the RPPA, defendants disclosed the breaches, plaintiffs discovered the breaches, or the breaches should have been discovered through due diligence prior to closing. By closing the transaction in the face of potential breaches, the trial court concluded that plaintiffs failed to exercise their rights under the agreement and waived any claim for such a breach. The trial court also found plaintiffs failed to meet their burden of proof establishing any

12

misrepresentation or concealment of a material fact, reliance, causation, intent or damages.

b. *Analysis*

Plaintiffs contend substantial evidence did not support the trial court's findings against them on their claims for misrepresentation, concealment and breach of contract related to the condition of the property. Specifically, plaintiffs contend defendants had a duty to disclose that they had made unpermitted improvements to the winery which were not code compliant; namely, defendants did not obtain permits when they (1) replaced the dirt floor in the barn with concrete without installing a foundation and (2) built a retaining wall.

Plaintiffs concede that defendants disclosed some construction issues, but argue they did not discover until after the transaction closed that the barn had originally been registered as an agricultural building and would need extensive work to bring it up to code for its current use as a winery. Plaintiffs also assert substantial evidence does not support the trial court's findings that: (1) the plot plan conditions of approval put them on notice regarding the foundation issues in the barn and the retaining wall; and (2) plaintiffs did not exercise due diligence before closing the transaction on the property.

As a preliminary matter, plaintiffs' contentions have surface appeal because Marshall conceded that he did not disclose the unpermitted retaining wall or that he poured a concrete floor in a portion of the barn. Based on our review of the entire record, however, it is clear that plaintiffs did not set forth all of the material

13

evidence, both favorable and unfavorable, to their position on the disputed issues. In this situation, we could have deemed them to have waived or forfeited their contentions that insufficient evidence supported the trial court's findings. (*Huong Que*, *supra*, 150 Cal.App.4th at pp. 409-410.) Nonetheless, we exercise our discretion to consider plaintiffs' claims on their merits. As discussed below, ample evidence supported the trial court's conclusion that the alleged unpermitted improvements on the property, including the unpermitted retaining wall, should have been discovered by plaintiffs had they exercised due diligence before closing the transaction.

Under section 4.1 of the RPPA, defendants had five days to provide information related to the property, including "any notices of violation or default received by any governmental authority with respect to the Property." Thereafter, plaintiffs were required to "promptly commence, and diligently and in good faith pursue, [their] due diligence review" of the property, including: (1) the feasibility of any improvements planned by plaintiffs, such as the cost and availability of building permits and other approvals necessary to construct the improvements; and (2) compliance with applicable laws, including use restrictions, building codes and health and safety laws. If plaintiffs were dissatisfied with the property following due diligence, they could terminate the agreement and have their deposit refunded.

Section 7.3 of the RPPA stated in relevant part: "[I]f either party receives notice, before Close of Escrow, of a breach of any representation or warranty made by the other party, and proceeds to Close of Escrow, such breach shall have

14

been waived." Finally, section 5.4 of the APA expressly noted that defendants' warranty regarding compliance with all requirements of federal, state and local laws was "subject to those requirements under the Plot Plan Application and Conditions of Approval affecting the Real Property."

Turning to the barn (winery building), there is no evidence showing defendants knew of any violations involving the barn, that defendants misrepresented or concealed any permitting issue regarding the barn or that plaintiffs could not have discovered the alleged problems with using the barn for a different purpose had they done their due diligence on the property. Rather, the evidence supports the trial court findings that plaintiffs would have discovered any alleged problems with the building had they conducted due diligence as required by the RPPA.

The two-story portion of the barn, consisting of a storage area, kitchen and bathroom below and a living space above, had an existing cement floor. When defendants purchased the property Marshall did not know whether the two-story portion of the barn had a footing or foundation. Marshall assumed, however, that the portion of the barn that he used for a commercial purpose, the tasting room and office, had a footing or foundation because when he purchased the property he saw that the county had permitted the building. Defendants used the remainder of the barn for barrel and case storage. Marshall testified that he had not received notice of any violation regarding the barn that was not addressed in the approved plot plan.

15

In 1996, when Marshall installed the cement floor in that portion of the barn that had been used to house horses, he did so without installing a footing or foundation for the cement floor. Marshall did not obtain a county permit for this work because poles supported the barn and he merely poured a concrete slab. Additionally, that portion of the barn with the new concrete floor would continue its agricultural use as a barrel and case storage facility. After Marshall installed the cement floor, his use of the barn never changed from an agricultural use to a commercial use and, 99 percent of the time, defendants used the barn for barrel and case storage. Marshall kept this wine storage area "blocked off" to the public with a curtain and signs stating the area was for employees only. Marshall considered the wine storage portion of the barn as an agricultural purpose. During his negotiations with Janko and during the escrow period, Marshall never mentioned anything to plaintiffs about the cement floor possibly needing a footing or foundation because he was not aware that a footing was required for that portion of the barn.

Escrow closed on the property in October 2011. Martin testified that Janko did not hire an inspector to look for code compliance until after escrow had closed. Janko claims he retained Marshall's engineering firm, Hunsaker, prior to closing. Hunsaker, however, merely reviewed the plot plan with Janko. Although the plot plan did not specifically address building code violations, it did specify that approval of the plot plan was conditioned on bringing the winery into conformance with all building codes. The trial court noted that section 5.4 of the

16

APA made defendants' warranty regarding compliance with all laws subject to the requirements in the plot plan (i.e., that all buildings would need to be in conformance with all building codes), and thus found that plaintiffs were on inquiry notice as to whether any code violations existed.

Janko presented no evidence that he had Hunsaker review county records regarding permits on the property before he closed the transaction.[5] Janko retained engineering expert, Larry Markham *after escrow closed* on the property. Markham reviewed the various applications that had been processed on the property over the past 10 to 15 years, the existing plot plan and conditions of approval for the property. Markham saw that an agricultural registration existed for the winery and that the house was properly permitted, but *no permits* existed for the winery building. He provided this information to Janko, who expressed dismay at the amount of work that would be needed. Markham conceded that the plot plan required that all structures needed to be made code compliant. Markham essentially testified that if Janko had consulted him and geotechnical and structural engineers when Janko received the plot plan and conditions of approval, he could

_____

[5]      Relying on *Rogers v. Warden* (1942) 20 Cal.2d 286, 288, and *Furla v. Jon Douglas Co.* (1998) 65 Cal.App.4th 1069, plaintiffs assert they had no duty to examine public records or engage an expert to protect themselves from defendants' fraud. While we have no quarrel with these statements as a general matter, these cases do not involve contractual provisions specifically requiring a party to (1) exercise due diligence regarding compliance with applicable laws, including building codes, and (2) determine that the buyer's planned improvements complied with applicable laws, including use restrictions, building codes and health and safety laws.

have made these determinations earlier. Markham was able to complete his work a few hours each day over a period of a few days.

John O'Donnell, defendants' civil engineer, testified that the tasting room in the barn was permitted and that Riverside County was allowing use of the tasting room and kitchen under a stipulation that upgrades would be implemented to bring the building up to current building code standards, including adding shear walls, structural hold downs to the foundation and tie-downs to the roof rafters. O'Donnell stated that as long as the barn was used as an agricultural building, it complied with the permit that had been issued. He also testified that it was permissible to have a commercial area in a portion of a permitted agricultural building and that adding a shear wall and a firewall would bring the building to code. Notably, the Riverside County Code of Ordinances provides that wineries can have sampling rooms and that a sampling room is considered an incidental commercial use.

After plaintiffs purchased the property, they substantially changed how the barn had been used by defendants. Immediately after closing the transaction, Janko removed everything from the barrel room and renovated the space to accommodate 150 seated guests. Janko installed televisions in the barrel room, a bar and tables for seating. Martin understood that Janko's changed use of the barn impacted its permitted use. Markham similarly conceded that one problem was Janko's use of an agricultural building for a commercial purpose, which triggered additional work on the building, including bringing the building up to structural

code standards. Appellants cited no evidence showing that the Stuarts knew how Janko planned to use the barn after the purchase.

This evidence supported the trial court's findings that plaintiffs failed to meet their burden of proving that the barn was not code compliant at the time of closing, that the plot plan placed defendants on inquiry notice regarding building code compliance issues and, had plaintiffs conducted due diligence before closing the transaction, they would have discovered any alleged problems with the barn for their intended use.

Turning to the unpermitted retaining wall, the evidence supports the trial court's findings that the plot plan and conditions of approval placed plaintiffs on inquiry notice regarding code compliance issues and that plaintiffs could have discovered any issues regarding the retaining wall had they conducted due diligence before closing the sales transaction as required by the contract. Significantly, had plaintiffs hired Markham before closing escrow on the property they would have discovered that the retaining wall, a readily visible improvement, did not have a permit. O'Donnell, defendants' civil engineer, testified that section 20.18 of the conditions of approval attached to the plot plan sets forth the requirement that the permittee's successors-in-interest (i.e., plaintiffs) obtain all necessary permits for all existing buildings and structures on the property and this requirement included the retaining wall and barn.

O'Donnell explained that it is common to obtain a permit for an existing structure. After speaking to a structural engineer for Riverside County and

19

performing some calculations, O'Donnell opined that the retaining wall exceeded building code requirements and there was "no question in [his] mind" that the retaining wall could be permitted. If for some reason the retaining wall could not be permitted, O'Donnell opined that the wall would not need to be removed as it was stronger than the soil, and that backfill could be added to create a slope. Even Keith Kulberg, plaintiffs' general contractor, admitted that a structural engineer could determine whether the retaining wall had been built to code and that it might be possible to obtain a permit for the retaining wall.

In summary, plaintiffs failed to meet their burden of showing the evidence did not support the trial court's findings that either defendants disclosed the breaches, plaintiffs discovered the breaches, or should have discovered the breaches, through due diligence prior to closing.[6]

3.    *Cell Tower Lease Revenues*

a.    *Additional background*

The RPPA provided that defendants had the right to approve service contracts that they elected to assume upon closing and that these service contracts would be listed on exhibit D to the RPPA. Exhibit D specified that the parties would complete the exhibit "during [the] feasibility period," which began on September 19, 2011, and ended October 15, 2011. On the day the parties executed

---

[6]    The trial court also found plaintiffs did not meet their burden of proof regarding damages, a finding plaintiffs did not contest in their opening brief. Defendants pointed out this oversight in their respondents' briefing, arguing the lack of damages supported the judgment in their favor. Based on the foregoing discussion, we need not address this issue.

the RPPA, Newcomb handwrote language onto exhibit D of the RPPA that recorded and unrecorded cell tower leases would be assigned to plaintiffs, but that all revenue from these leases was retained by the Stuarts. On the copy of the RPPA signed by Janko, exhibit D is blank. At closing, Newcomb withdrew the handwritten exhibit D, telling the escrow company it was no longer necessary. All parties signed a version of exhibit D which stated: "No contracts to be assigned after due diligence during the feasibility period."

Plaintiffs' amended complaint sought declaratory relief, alleging a controversy existed regarding the entitlement to cell tower lease payments for a cell tower lease on the property. Plaintiffs contend that the lease and the right to receive all payments under the lease transferred to them when they purchased the property, whereas defendants contend that they have the right to continue to receive the cell tower lease payments.

Defendants argued that the cell tower revenues were not properly excluded from the transaction based on a mutual mistake of the parties. The trial court agreed, noting that before selling the property to plaintiffs, defendants had substantially completed a separate deal to sell the revenue from the cell towers to another party and the communications between the parties showed that all parties understood that the cell tower leases were not part of the transaction. As support for this finding, the trial court referenced paragraph 8(f) of the RPPA which specifically allowed defendants to negotiate the cell tower leases while the real property transaction was pending. The court stated: "When taken in context with

21

the other communications between the parties, this provision reinforces the factual finding that any failure to exclude the cell tower lease revenue was a mutual mistake by the parties." Based on its findings, the trial court ordered that the deed to the property be reformed to designate that all cell tower lease income belonged to the Stuarts.

        b.    *Legal principles*

"When, through . . . mistake . . . , a written contract fails to express the real intention of the parties, such intention is to be regarded, and the erroneous parts of the writing disregarded." (Civ. Code, § 1640.) If there is "a mutual mistake of the parties, or a mistake of one party, which the other at the time knew or suspected," a written contract "may be revised, on the application of a party aggrieved, so as to express that intention, so far as it can be done without prejudice to rights acquired by third persons, in good faith and for value." (Civ. Code, § 3399.)

A "court may only reform the writing to conform with the mutual understanding of the parties at the time they entered into it, if such an understanding exists." (*Hess v. Ford Motor Co.* (2002) 27 Cal.4th 516, 524.) Parole evidence is "admissible to show mutual mistake even if the parties intended the writing to be a complete statement of their agreement" "because the court must divine the true intentions of the contracting parties and determine whether the written agreement accurately represents those intentions." (*Id.* at p. 525.)

A mistake of fact is defined, in part, as "a mistake, not caused by the neglect of a legal duty on the part of the person making the mistake." (Civ. Code,

22

§ 1577.)  "[O]rdinary negligence does not constitute neglect of a legal duty within the meaning of Civil Code section 1577."  (*Donovan v. RRL Corp.* (2001) 26 Cal.4th 261, 283.)  "In determining what conduct will amount to a neglect of duty the courts recognize there is an element of carelessness in nearly every case of mistake [citation] and that which does not amount to the neglect of a legal duty will not of itself bar" equitable relief.  (*Reid v. Landon* (1958) 166 Cal.App.2d 476, 482.)  "Only where the mistake results from 'a failure to act in good faith and in accordance with reasonable standards of fair dealing' " is equitable relief unavailable.  (*Donovan*, at p. 283.)

      c.     *Analysis*

Plaintiffs contend the trial court's granting of the cell tower revenues to defendants is not supported by substantial evidence.  They assert no basis existed for reformation of the deed as no mutuality of understanding existed as to the cell tower income.  We are not persuaded.

The evidence shows the parties mutually understood that the cell tower income was not part of the transaction.  Marshall testified that there was never any discussion of including the cell towers in the sale of the property to plaintiffs.  Rather, Marshall and Newcomb discussed with Martin that the cell towers were not part of the transaction when Martin was still listed as the buyer.  When Marshall signed the RPPA, he instructed Newcomb to write on exhibit D that the cell tower income was excluded.  The handwritten version of exhibit D entitled Marshall to all past and future revenue from the cell towers.  Marshall directed

23

Newcomb and Martin to tell Janko about exhibit D because it was important to Marshall for Janko to know that the cell towers were not part of the purchase.

Martin's testimony mirrored Marshall's. Martin had a conversation with Janko that the income from the cell tower leases was excluded from the transaction because the Stuarts wanted to keep that income or keep the leases in their name and that the title insurance policy would exclude the leases. Martin could not recall if he told Janko that the leases had been sold or were in the process of being sold, but Martin believed that he informed Janko that the Stuarts were waiting for a do not disturb agreement to construct another cell tower on the property. Martin informed Janko that the cell tower leases were excluded from the transaction, and used the term "stripped" to convey this to Janko.[7]

Martin testified that Janko acknowledged his understanding that the cell tower leases were excluded from the transaction. Martin had "no doubt" that the Stuarts were supposed to receive all the income from the cell tower leases and, if the Stuarts did not receive this income, this would have constituted a mistake based on his understanding of the parties' agreement. Martin suggested that the cell tower leases be included in exhibit D because this is where exclusions to the

---

[7]   Citing *Ward v. Yorba* (1899) 123 Cal. 447, plaintiffs assert that any shared understanding between Martin and the Stuarts regarding the cell tower income is irrelevant because Janko did not share this mutual understanding. This argument ignores that Martin imparted his knowledge regarding the cell towers to Janko and Janko expressed his understanding in an e-mail that the cell tower leases were not part of the deal.

transaction were to be listed. Newcomb, however, never had Janko sign the copy of exhibit D that contained his handwritten notation.

In e-mail correspondence between Martin and Newcomb that was copied to Janko, Martin informed Newcomb and Janko that he had copies of the cell tower leases from the title insurance company so that they could be excluded from the transaction. The title insurance policy, which Martin reviewed, excluded the cell tower leases and another unrecorded cell tower lease. Martin communicated this information to Newcomb and Janko. This evidence amply supported the trial court's conclusion that all parties understood that the cell tower income was not part of the transaction.[8]

Plaintiffs argue there was no mutual mistake and that reformation was inappropriate because the parties did not share the same understanding of the transaction. To support this contention, plaintiffs cite to a portion of Martin's testimony where he stated that plaintiffs' cell tower income had already been contractually obligated and those cell towers were no longer an issue.

Plaintiffs inappropriately focus on "why," rather than "what." The evidence supports the conclusion that the parties to the transaction understood *what* was excluded from the transaction — the cell towers and their revenue. *Why* the cell

_____

[8] Both sides note that Janko did not attempt to renegotiate the purchase price for the property, with defendants arguing this proved Janko knew the cell tower income was excluded from the transaction and plaintiffs contending the fact had no significance. Based on the foregoing discussion we decline to reconcile these differing viewpoints on this piece of evidence.

towers and their revenue were excluded from the transaction is not the issue. Thus, the fact Martin believed the cell tower income was excluded from the transaction because defendants had already sold it off is of no significance. Plaintiffs attempt to make this fact significant by noting that the reformed deed awarded all cell tower revenues to the Stuarts. Plaintiffs argue they did not contemplate having "this sort of enduring commitment to the Stuarts" or that the deed might require future revisions.

As to the first point, plaintiffs' understanding that the cell tower revenue would not belong to them necessarily means the revenue would be going elsewhere. Whether the revenue went to the Stuarts or some third party does not change the nature of plaintiffs' commitment regarding the cell towers on the property. As to the second point, the RPPA does not support this assertion as it included a provision that the parties would execute other instruments that may become necessary to consummate the transaction.

Anticipating we might conclude that substantial evidence supported the trial court's finding of mutual mistake, plaintiffs argue that the trial court erred in reforming the deed to reserve the cell tower payments to the Stuarts because: (1) defendants' counsel drafted the RPPA and thus defendants' neglect caused the error; (2) the reformation conflicts with the express language of the RPPA; and (3) the cell tower income was not material to the transaction.[9]

---

[9] We discuss the propriety of the trial court's amendment of the cross-complaint to include a claim for reformation in part III., *post*.

It is undisputed that Newcomb wrote on exhibit D that the cell tower income would be reserved to the Stuarts. This was not the mistake at issue as the evidence shows all parties understood at the outset of the transaction that the cell tower revenues were not a part of the transaction. The mistake occurred when Janko's version of the RPPA did not contain a copy of exhibit D with the handwritten language. Apparently, the parties are unaware how this mistake occurred. The trial court reasonably could have concluded that defendants' failure to notice that Janko's version of the RPPA did not contain a copy of exhibit D with the handwritten language did not amount to the neglect of a legal duty sufficient to bar equitable relief.

Plaintiffs note that the RPPA transferred all leases, including the right to collect future rents. Plaintiffs argued to the trial court that this recital is conclusively presumed true. Again, plaintiffs focus on the wrong language. The mistake lies not in this language, but in the fact that Janko's copy of exhibit D did not contain the handwritten provision excluding the cell tower revenue from the transaction. Ultimately, all parties signed a copy of exhibit D that provided no contracts were being assigned. This version of exhibit D comports with the intent of the parties that the cell tower leases and revenue were not part of the transaction.

Finally, plaintiffs cite to *Roller v. California Pacific Title Ins. Co.* (1949) 92 Cal.App.2d 149 for the proposition that a contract may only be reformed if the

requested reformation is material to the transaction. Plaintiffs contend the trial court improperly reformed the RPPA because the cell tower income was not material to the transaction. To support this assertion, they cite to a portion of Marshall's testimony where he purportedly testified that he would have entered into the transaction even if the cell tower income had not been reserved to him. Defendants do not challenge plaintiffs' assertion that reformation can only be granted if the requested reformation is material to the transaction. Rather, defendants claim the evidence shows the cell tower income was material to the transaction. The evidence supports defendants' assertion.

As defendants point out, the cell tower contracts were valued at approximately $250,000. The purchase price for the property was $3,175,000. Thus, the cell tower contracts accounted for just under 8 percent of the value of the property. Moreover, that portion of Marshall's testimony relied on by plaintiffs does not support their argument. Plaintiffs' counsel asked Marshall two confusing hypothetical questions, namely:

> "[Q:] [I] present you with a hypothetical. For the purposes of this question, I want you to assume two things: One, that Mr. Janko is not aware that the cell tower leases would be generating future income, okay? Did you hear that?
>
> "A. Yes.
>
> "Q. And two, had Mr. Janko known that those cell tower leases would be generating future income, assume that Mr. Janko would have never agreed to allow you to keep the revenue from those leases for those cell towers that exist on his property, okay? Now given those two -- one, two -- those two factors, would you still have entered into this contract with Mr. Janko?"

28

"[A]: Yeah, I still would have entered into the contract."

Plaintiffs' counsel then queried Marshall as to whether he understood the hypothetical, with Marshall responding that he did not understand what was being asked. Plaintiffs' counsel re-read the hypothetical questions, but the trial court cut off the line of questioning, citing Evidence Code 352 and undue consumption of time. In light of what transpired at trial and the confusing nature of the two hypothetical questions, the trial court reasonably could have concluded that Marshall's testimony was not probative on the materially of the cell tower income to the transaction.

In summary, the evidence adequately supported the trial court's finding of mutual mistake regarding the cell tower revenues.

C.    *Amendment of Cross-complaint*

1.    *Additional Background*

Defendants argued that, assuming a mutual mistake occurred in the formation of the contract, reformation of the documents was warranted to reflect the intent of the parties to exclude the cell tower revenues from the transfer. Although defendants pled mutual mistake in their answer, they did not seek reformation in their cross-complaint. During trial, the court queried whether reformation needed to be pled as affirmative relief. After considering briefing on the matter, the trial court reserved its ruling until after it heard the evidence regarding mutual mistake. The trial court later granted defendants' motion to

29

conform to proof and ordered that the deed to the property be reformed to designate that all cell tower lease income shall belong to the Stuarts.

2.  *Analysis*

A trial court has discretion to allow parties to amend their pleadings "in furtherance of justice."  (§ 473, subd. (a)(1).)  Leave to amend may be granted even after the commencement of trial.  (§ 576.)  Amendment is proper if the variance between the pleading and proof is not material (§ 470) and no variance is material "unless it has actually misled the adverse party to his prejudice in maintaining his action or defense upon the merits."  (§ 469.)

A trial court abuses its discretion in permitting an amendment if the amendment presents new and substantially different issues that the opposing party has no opportunity to defend, or if the rights of the opposing party were prejudiced by the amendment.  (*Trafton v. Youngblood* (1968) 69 Cal.2d 17, 31.)  In deciding to allow an amendment during trial, courts are guided by two general principles: " '(1) whether facts or legal theories are being changed and (2) whether the opposing party will be prejudiced by the proposed amendment.  Frequently, each principle represents a different side of the same coin:  If new facts are being alleged, prejudice may easily result because of the inability of the other party to investigate the validity of the factual allegations while engaged in trial or to call rebuttal witnesses.  If the same set of facts supports merely a different theory . . . no prejudice can result.' "  (*Garcia v. Roberts* (2009) 173 Cal.App.4th 900, 910.)

30

Plaintiffs contend the trial court abused its discretion in amending defendants' cross-complaint to assert a claim for reformation because defendants inexcusably delayed in asserting the claim and the amendment prejudiced them as they were not provided an opportunity to present experts regarding the intricacies of transactions involving cell towers. We are not persuaded.

Defendants alleged mutual mistake regarding the cell tower revenues from the outset of the case. While defendants' cross-complaint did not seek reformation, defendants alleged they were entitled to the cell tower revenues in both their first and second amended cross-complaints. Additionally, plaintiffs' first amended complaint contained a claim for declaratory relief regarding whether defendants had the right to continue receiving the cell tower revenues.

Accordingly, the amendment merely added a new remedy based on the same factual issues. (*Western Title Guaranty Co. v. Sacramento & San Joaquin Drainage Dist.* (1965) 235 Cal.App.2d 815, 823 ["[r]eformation is nothing but a remedy to correct a mistake in a written instrument"].) Plaintiffs attempt to show prejudice by arguing the late amendment denied them the opportunity to present expert testimony regarding cell tower leases. Plaintiffs, however, failed to cite to any portion of the record showing they made this argument below. Thus, we deem it waived. (*Ochoa v. Pacific Gas & Electric Co.* (1998) 61 Cal.App.4th 1480, 1488, fn. 3.) On this record, the trial court did not abuse its discretion in allowing defendants to amend their cross-complaint to conform to proof.

D.      *Expert Witness Fees*

1.      *Additional Background*

Defendants sought $42,978.87 in expert witness fees. Plaintiffs moved to tax these expenses on the ground expert witness fees were not allowable under subdivision (b)(1) of section 1033.5. Relying on *Thrifty Payless, Inc. v. Mariners Mile Gateway, LLC* (2010) 185 Cal.App.4th 1050 (*Thrifty*), the trial court awarded defendants their expert witness fees based on a provision in the RPPA stating that the prevailing party could recover costs, including "experts' fees." Plaintiffs assert *Thrifty* was wrongly decided and we should follow *Fairchild v. Park* (2001) 90 Cal.App.4th 919 (*Fairchild*).

Section 1033.5 specifies items which are allowable and not allowable as costs under section 1032. Subdivision (b)(3) of section 1033.5 provides that "[f]ees of experts not ordered by the court" are not allowable as costs. The *Thrifty* court noted that where a contract provision entitles a prevailing party to " ' "reasonable attorney's fees and costs," ' or similar nonspecific language," courts have held that such language must be interpreted in light of the limits set forth in section 1033.5. (*Thrifty*, *supra*, 185 Cal.App.4th at p. 1065.) Nonetheless, it reasoned that when parties explicitly provide for recovery of expert witness fees in a freely negotiated contract, such fees may be recovered by including them on a memorandum of costs and proving them if a motion to tax costs is filed. (*Id.* at p. 1066.)

The *Thrifty* court did not cite *Fairchild*, an earlier case that addressed a one-way attorney fee provision requiring tenants to pay the landlord's costs, expenses, and reasonable attorney fees. (*Fairchild*, *supra*, 90 Cal.App.4th at p. 923.) For purposes of analysis, the *Fairchild* court assumed that a contractual term allowing a prevailing party to recover " 'all costs and expenses' " included items disallowed under section 1033.5 (such as expert fees), but concluded that parties "cannot expand the definition of 'costs' in [Civil Code] section 1717 to include items not permitted under section 1033.5." (*Fairchild*, at p. 929.)

In reaching this conclusion, the *Fairchild* court applied the reasoning of *Santisas v. Goodin* (1998) 17 Cal.4th 599 (*Santisas*), which held that the legislative history of Civil Code section 1717 reflects the intent " 'to establish uniform treatment of fee recoveries in actions on contracts containing attorney fee provisions and to eliminate distinctions based on whether recovery was authorized by statute or by contract. A holding that in contract actions there is still a separate contractual right to recover fees that is not governed by [Civil Code] section 1717 would be contrary to this legislative intent.' " (*Fairchild*, *supra*, 90 Cal.App.4th at p. 929.) "Just as *Santisas* precludes litigants from adopting a definition of 'prevailing party' that differs from Civil Code section 1717, we conclude, for the same reasons, that litigants cannot expand the definition of 'costs' in [Civil Code] section 1717 to include items not permitted under section 1033.5." (*Id.* at p. 929.)

The analysis used by the *Fairchild* court makes it distinguishable from *Thrifty*. The tenants in *Fairchild* sought to utilize the reciprocity provisions of

Civil Code section 1717 to entitle them, as the prevailing parties, to an award of " 'all costs and expenses.' " (*Fairchild*, *supra*, 90 Cal.App.4th at p. 929.) Here, and in *Thrifty*, the parties did not rely on Civil Code section 1717, but rather on the explicit language of a freely negotiated contract where the parties expressly agreed the prevailing party could recover its expert fees. Put simply, the reciprocity provision of Civil Code section 1717 is not at issue in this situation.

Finally, *Fairchild* is part a line of cases addressing statutory construction and *general* cost provisions where the parties did not expressly agree that the prevailing party could recover its expert fees. As our high court recognized in another statutory construction case, "[o]ur present analysis, which involves statutory construction, may not be dispositive in a matter involving the effect of a contractual agreement for shifting litigation costs, which turns on the intentions of the contracting parties." (*Davis v. KGO-T.V., Inc.* (1998) 17 Cal.4th 436, 446, at fn. 5.)

Accordingly, we reject plaintiffs' argument that the trial court erred when it awarded defendants their expert witness fees.

DISPOSITION

The judgment and order are affirmed.


IRION, J.

WE CONCUR:


BENKE, Acting P. J.


PRAGER, J.*

---

\*      Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.